Filed 10/1/24  P. v. Mitchell CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098293 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE013583) |
| v. | |
| LEMAR GATHAN MITCHELL, | |
| Defendant and Appellant. | |

Suspecting criminal activity, a law enforcement officer patrolling a residential area drove up behind a car driven by defendant Lemar Gathan Mitchell and activated his lights and siren.  Mitchell immediately drove away, a high-speed chase ensued, and Mitchell eventually exited the car and fled on foot.  An AR-15 rifle and Mitchell's cell phone were found in the abandoned car, and a Glock handgun was discovered along the path where Mitchell had fled.  Before releasing the car Mitchell had been driving from impound, law enforcement affixed a Global Positioning System (GPS) tracking device to it.  Three weeks later, after tracking the GPS signal from the vehicle, law enforcement went to a

1

house where Mitchell had been seen.  After an hours-long standoff, during which Mitchell resisted officers and assaulted a police dog, officers took Mitchell into custody.

A jury found Mitchell guilty of transporting an assault weapon, two counts of possession of a firearm by a felon, evading a peace officer, striking a police dog, and resisting a peace officer.  The trial court found true the allegation that Mitchell had a prior strike conviction and sentenced Mitchell to 14 years eight months in state prison.

On appeal, Mitchell argues that the trial court prejudicially erred:  (1) in connection with his motion to suppress evidence by (a) finding the detective was legally justified in detaining him, (b) not excluding evidence discovered through a search of his cell phone, and (c) failing to exclude additional evidence flowing from the warrantless GPS tracking of Mitchell's car; (2) by denying his motion to dismiss count one, transporting an assault weapon, for insufficient evidence; and (3) in giving a special jury instruction relating to the assault weapon count.

The People concede the trial court committed reversible error in giving the special jury instruction and we agree.  We will reverse the judgment as to count one and remand for the People to retry Mitchell on that count if they so choose, and, in any event, for a full resentencing.  We otherwise will affirm the judgment.

BACKGROUND

An amended information charged Mitchell with transporting an assault weapon (Pen. Code, § 30600, subd. (a); count one);[1] possession of a firearm by a felon (§ 29800, subd. (a)(1); counts two & three); evading a peace officer with willful or wanton disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a); count four); failing to stop at the scene of an accident (Veh. Code, § 20002, subd. (a); count five); willfully, maliciously, and without legal justification striking, beating, or kicking a

---

[1]     Undesignated statutory section references are to the Penal Code.

2

dog under the supervision of a peace officer (§ 600, subd. (a); count six); and resisting a peace officer during the discharge of their duties (§ 148, subd. (a)(1); count seven). The information further alleged that Mitchell had been convicted of a prior strike. (See §§ 1192.7, subd. (c), 667, subd. (b)-(i), 1170.12.)

*The Trial*

On August 2, 2020, Sacramento County Sheriff's Office Detective Sina Ghaffarpour was on patrol in Rancho Cordova when he observed a BMW driven by a shirtless adult male whom he identified at trial as Mitchell. He encountered the same vehicle and driver a little while later parked in front of a residence. For reasons we will recite below, Detective Ghaffarpour believed he had reasonable suspicion to make contact with Mitchell. He drove towards the BMW and activated his vehicle's red and blue lights and siren. The BMW suddenly drove off through the residential neighborhood with Detective Ghaffarpour in pursuit. The speed limit in the area was likely 25 miles per hour and Detective Ghaffarpour estimated that he pursued the BMW at 65 miles per hour. The pursuit ended when the BMW pulled into a driveway and collided with a house. When Detective Ghaffarpour caught up to the BMW, the driver's door was open, and Mitchell was no longer in the car.

In the BMW, Detective Ghaffarpour found on the floorboard of the back seat, under a black plastic bag, a loaded AR-15 rifle with a 30-round magazine and a live round in the chamber. The AR-15 rifle had centerfire ammunition in its firing chamber, a pistol grip, and a detachable magazine. Detective Ghaffarpour did not know whether the component on the end of the AR-15 rifle barrel was a flash suppressor or a muzzle brake. Detective Ghaffarpour also found an unlocked cell phone on the driver's seat. He opened a social media application profile and recognized Mitchell in the photograph.

The resident of the house the BMW had rolled into approached Detective Ghaffarpour and told him an individual matching Mitchell's description had run through his backyard and jumped the fence. The resident directed Detective Ghaffarpour to a

3

loaded Glock handgun in the backyard with a high-capacity magazine and a live round in the chamber. The handgun was found along Mitchell's path of flight.

Having traced the ownership history of the BMW to a car dealership in Rancho Cordova, Detective Ghaffarpour went to the dealership and spoke with the owner. He identified T.M.[2] as the purchaser of the BMW. She had been accompanied by Mitchell at the time of purchase. According to the dealership owner, Mitchell selected the car but he wanted it registered in T.M.'s name. The dealership owner furnished Detective Ghaffarpour with paperwork, including a credit application. T.M. was listed as the registered owner, but Mitchell also was listed on the credit application.

Approximately three weeks later, on August 24, 2020, law enforcement learned that the BMW, which had been released after a GPS tracking device was concealed on it, was at a house in Elk Grove. After Mitchell was seen at the house, law enforcement officers surrounded it and made announcements for two hours trying to get Mitchell to exit. Some family members in the home came out, but Mitchell did not. Law enforcement fired tear gas into the detached pool house where they believed Mitchell was located, but he did not emerge. Officers then breached the pool house door and deployed Riley, a police dog. Riley located Mitchell and "they began fighting." An officer fired a beanbag shotgun at Mitchell, but Mitchell continued to fight with Riley, punching him, lifting him up, and choking him. Officers advanced and, at some point, "went hands on" with Mitchell, handcuffed him, and took him into custody. The parties stipulated that Mitchell had previously been convicted of a felony offense.

*Verdict and Sentencing*

The jury found Mitchell guilty of transporting an assault weapon on count one, possession of a firearm by a felon on counts two and three, evading a peace officer on

---

[2]   To protect her privacy, we refer to this witness by her initials. (Cal. Rules of Court, rule 8.90(b)(10).)

4

count four, striking a police dog on count six, and resisting a peace officer attempting to discharge their duties on count seven. The jury found Mitchell not guilty of failing to stop at the scene of an accident on count five. In a bifurcated proceeding, the trial court found the prior strike allegation to be true.

The trial court denied Mitchell's motion to strike his prior strike conviction and sentenced him to a determinate term of 14 years eight months in state prison, consisting of the middle term of six years on count one, doubled for the prior strike; the middle term on count two stayed pursuant to section 654; and eight months, one-third the middle term, on counts three and four, each doubled to one year four months for the prior strike. The court imposed no additional time on the misdemeanor counts, six and seven.

DISCUSSION

I

*Motion to Suppress*

A. *Additional Background*

Mitchell filed a motion pursuant to section 1538.5 to suppress "all tangible and intangible evidence obtained as the result of any illegal act including, but not limited to: Motorola cell phone, AR-15 rifle, Glock 17 handgun, ammunition, and observations by law enforcement officers." Mitchell asserted there was no legal justification for his initial detention on August 2, 2020, and that there was no legal justification for a warrantless search of his cell phone. He later supplemented his motion, seeking to suppress "all tangible and intangible evidence obtained from the warrantless" GPS tracking of the BMW.

At the hearing on Mitchell's suppression motion, Detective Ghaffarpour testified that, on August 2, 2020, he observed the BMW driven by a shirtless adult male, Mitchell, with no other occupants in the vehicle. As he continued patrolling, Detective Ghaffarpour saw the BMW again, this time parked in front of a residence. It had a standard California license plate on the front and a temporary plate on the rear, which did

5

not match the letters and numbers on the front plate. This made him suspicious because, in his training and experience, individuals engaged in criminal activity sometimes use different license plates on their vehicles to avoid detection while committing crimes. Detective Ghaffarpour ran a records check and discovered the vehicle was registered to a woman, T.M., at an address different from where the BMW was parked. Mitchell drove the BMW into the residence's driveway, backed up, and then drove forward again. Detective Ghaffarpour believed Mitchell's activity could be indicative of a burglary or theft crime commonly associated with the "high crime area." He thus believed he had reasonable suspicion to make contact with Mitchell.

Detective Ghaffarpour activated his red and blue lights and siren as he approached the BMW from behind. The BMW backed out of the driveway and almost struck Detective Ghaffarpour's vehicle, stopped momentarily, and then sped off. As Detective Ghaffarpour pursued the BMW through the residential neighborhood, Ghaffarpour reached speeds of 65 miles per hour, and the BMW was outpacing him. At times, Detective Ghaffarpour lost sight of the vehicle and, at other times, the vehicle was a significant distance away. Eventually, Detective Ghaffarpour observed the vehicle in a driveway with the driver's door open and no one in the vehicle. The BMW had collided with a residence. Detective Ghaffarpour believed the BMW's engine was still running at the time. An individual exited the residence and told Detective Ghaffarpour that a shirtless adult male matching Mitchell's description had run through his backyard. The resident directed Detective Ghaffarpour to a loaded nine-millimeter handgun with a high-capacity magazine and a round in the chamber in the backyard along the path where the driver had fled. Law enforcement did not find Mitchell on August 2, 2020.

Detective Ghaffarpour searched the BMW. He discovered a loaded AR-15 rifle on the rear floorboard and an unlocked cell phone on the driver's seat. On the cell phone, Detective Ghaffarpour opened a social media application and immediately recognized the profile photo as Mitchell, and he eventually connected the username to Mitchell.

6

On August 24, 2020, Sacramento County Sheriff's Deputy Benjamin Gill was searching for Mitchell who had a felony warrant. Deputy Gill located Mitchell by tracking a GPS device law enforcement had attached to the BMW on August 5 "when it was in the tow yard." GPS monitoring had been a term of Mitchell's previously imposed postrelease community supervision, so Deputy Gill did not believe he needed a warrant to affix the GPS device to the BMW.

The trial court denied Mitchell's motion to suppress insofar as it was based on a lack of justification for the detention, concluding Detective Ghaffarpour had reasonable suspicion to justify the stop. The court also denied the motion to suppress evidence related to the cell phone, concluding it had been abandoned. The court also concluded, however, that Mitchell's postrelease community supervision from 2015 did not extend indefinitely, notwithstanding the fact that he absconded, and, therefore, a warrant was required to place the GPS device on the BMW. The court therefore granted the request to suppress GPS evidence.

Defense counsel noted that the GPS data allowed law enforcement to track Mitchell to the location of his arrest, and that counts six and seven related to events occurring during his arrest. He sought dismissal of counts six and seven and suppression of all evidence "gleaned from" the GPS device. The trial court denied Mitchell's request to dismiss counts six and seven, and denied his request to suppress all other evidence stemming from the use of the GPS device as too vague and not previously pled with notice.

B. *Applicable Principles of Law*

"The Fourth Amendment protects against unreasonable searches and seizures." (*In re Raymond C.* (2008) 45 Cal.4th 303, 307.) "The touchstone of the Fourth Amendment is reasonableness." (*Ibid*.) " 'A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective

7

manifestation that the person detained may be involved in criminal activity.' " (*Ibid*.) "Whether an officer's conduct was reasonable is evaluated on a case-by-case basis in light of the totality of the circumstances." (*Ibid*.) " ' "In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment." ' [Citation.] In doing so we do not consider each fact in isolation. Instead, 'we must consider "the totality of the circumstances—the whole picture." ' " (*People v. Flores* (2024) 15 Cal.5th 1032, 1043.)

      C. *Initial Detention*

      Mitchell asserts the trial court erred in denying his suppression motion because the court improperly concluded there was reasonable suspicion to justify his initial detention. Before addressing reasonable suspicion, the People argue as a threshold matter that Mitchell was never detained before he fled in the BMW and, later, on foot, and therefore there was no Fourth Amendment violation.[3] We agree.

      A detention or seizure may occur " 'by means of physical force or show of authority . . . .' " (*People v. Brown* (2015) 61 Cal.4th 968, 974, quoting *Terry v. Ohio*

---

**3**    In his reply brief, Mitchell argues the People "concede[] that this argument was not made in the lower court." This is incorrect. On the page cited by Mitchell, the People acknowledged that the *trial court* did not rely on this argument. The prosecution did argue in the trial court: "I don't know if you can sufficiently establish that [Mitchell] was actually detained since he didn't actually feel free enough to leave since he actually fled from the officer." Moreover, " ' we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364-365.) " ' "[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

(1968) 392 U.S. 1, 19, fn. 16.) "In situations involving a show of authority, a person is seized 'if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," ' or ' "otherwise terminate the encounter," ' [citation], *and if the person actually submits to the show of authority*." (*Brown, supra*, 61 Cal.4th at p. 974, italics added; see *California v. Hodari D.* (1991) 499 U.S. 621, 625-626 [holding that a seizure does not occur where law enforcement makes a show of authority, but the subject does not submit to that authority].)

A case from the United States Court of Appeals for the District of Columbia Circuit involves facts similar to those at issue here. While we "are not bound by the decisions of the lower federal courts even on federal questions," those decisions "are persuasive and entitled to great weight." (*People v. Bradley* (1969) 1 Cal.3d 80, 86.) In *United States v. Washington*, after an officer driving a marked police car activated his siren and ordered a vehicle to stop, the driver obeyed. (*United States v. Washington* (D.C. Cir. 1994) 12 F.3d 1128, 1131.) However, as the officer approached the vehicle on foot, it sped away. (*Ibid*.) In challenging the denial of his suppression motion, the driver contended that when the officer "activated his sirens and ordered the driver . . . to stop, he effectuated a seizure within the meaning of the Fourth Amendment." (*Id*. at p. 1132.) The appellate court concluded that "[a]lthough a reasonable person would not have believed that she [or he] was free to continue driving once [the] [o]fficer . . . activated his sirens and ordered the . . . driver to stop, [the driver] did not in fact submit to the officer's order. [The driver] initially stopped, but he drove off quickly before [the ] [o]fficer . . . even reached the car. Because [the driver] did not submit to [the officer's] order, he was not seized within the meaning of the Fourth Amendment." (*Ibid*.)

Here, we conclude that Detective Ghaffarpour engaged in a show of authority when he approached the driveway where the BMW was parked with his blue and red lights and siren activated. (*People v. Brown, supra*, 61 Cal.4th at p. 978 ["activating sirens or flashing lights can amount to a show of authority"]; see *id*. at p. 980 [declining

9

to "adopt a bright-line rule that an officer's use of emergency lights in close proximity to a parked car will always constitute a detention"].)

As in *Washington*, however, Mitchell never submitted to Detective Ghaffarpour's show of authority. In fact, this conclusion is more compelling here than in *Washington*. In that case, the driver briefly complied with the officer's order, stopping his moving vehicle. (*United States v. Washington, supra*, 12 F.3d at p. 1131.) Here, Mitchell backed out of the driveway, almost striking Detective Ghaffarpour's vehicle, stopped momentarily, perhaps to shift the transmission from reverse into drive or first gear, and then sped off. Then, after a high-speed pursuit, Mitchell abandoned the BMW and fled on foot, temporarily evading law enforcement. Whereas in *Washington* there was some arguable evidence of compliance, here there was no evidence at all of Mitchell's submission to Detective Ghaffarpour's authority.

We thus conclude Mitchell did not submit to Detective Ghaffarpour's authority. (*United States v. Washington, supra*, 12 F.3d at p. 1131; see also *United States v. Jeter* (6th Cir. 2013) 721 F.3d 746, 750, 752-753 [the defendant, who paused briefly when approached by officers, then ignored officers, discarded his bicycle, and fled on foot, did not submit to authority]; *United States v. Hernandez* (9th Cir. 1994) 27 F.3d 1403, 1406-1407 [the defendant's actions in hesitating for a moment as an officer approached, looking directly at the officer, and then fleeing were not sufficient to constitute submission to authority].) Because Mitchell did not submit to Detective Ghaffarpour's authority, there was no seizure or detention. "Where there is no seizure, there can be no Fourth Amendment violation." (*Jeter, supra*, 721 F.3d at p. 753.) We uphold the denial of Mitchell's suppression motion on this ground.

D. *Search of Mitchell's Cell Phone*

Mitchell argues the trial court erred in determining that his cell phone had been abandoned and that no warrant was required to search it. We disagree.

10

Generally, before searching data stored on a cell phone, law enforcement must obtain a search warrant. (*Riley v. California* (2014) 573 U.S. 373, 386.) However, a "warrantless search and seizure involving abandoned property is not unlawful, because a person has no reasonable expectation of privacy in such property." (*People v. Parson* (2008) 44 Cal.4th 332, 345 (*Parson*).) " '[T]he intent to abandon is determined by objective factors, not the defendant's subjective intent. " 'Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other *objective* facts. [Citations.] Abandonment here is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search.' " ' " (*Id*. at p. 346, quoting *People v. Daggs* (2005) 133 Cal.App.4th 361, 365-366 (*Daggs*).) " 'The question whether property is abandoned is an issue of fact, and the court's finding must be upheld if supported by substantial evidence.' " (*Parson, supra*, 44 Cal.4th at p. 346.)

Here, Detective Ghaffarpour attempted to detain Mitchell by activating his emergency lights and siren, but Mitchell drove away. After a brief high-speed chase, Mitchell exited the BMW and fled on foot. The BMW rolled into a residence, the driver's door was left open, and, as Detective Ghaffarpour recalled, its engine was still running. Detective Ghaffarpour located the unlocked cell phone on the driver's seat.

We conclude that substantial evidence supports the trial court's determination that Mitchell abandoned the cell phone. "[P]roperty is abandoned when a defendant voluntarily discards it in the face of police observation, or imminent lawful detention or arrest, to avoid incrimination." (*Daggs, supra*, 133 Cal.App.4th at p. 365.) Exiting the BMW and fleeing on foot, Mitchell abandoned the BMW and everything in it, including the cell phone, by running away from the car and its contents in the face of police observation and imminent detention so as to avoid incrimination. His decision to flee and leave the cell phone behind demonstrated an intent to abandon the cell phone. There is

11

no evidence that Mitchell ever attempted to recover his cell phone. Instead, the objective facts demonstrate Mitchell " ' " 'so relinquished his interest in the [cell phone] that he no longer retained a reasonable expectation of privacy in it at the time of the search.' " ' " (*Parson, supra*, 44 Cal.4th at p. 346.)

Nor are we persuaded that the BMW's recovery from the police impound lot demonstrates that Mitchell did not abandon his cell phone. A third party's recovery of the vehicle, at least three days later, has no bearing on the objective facts surrounding Mitchell's intent, his abandonment of the cell phone, or whether he maintained a reasonable expectation of privacy in the phone.

In *Daggs*, on which the prosecutor relied in the trial court, when police arrived at a store following a robbery, officers found a cell phone near the cash register where an employee had confronted the defendant. (*Daggs, supra*, 133 Cal.App.4th at p. 364.) In the 20 to 30 minutes during which police were at the store, no one attempted to claim the cell phone. (*Ibid.*) Police booked the cell phone into evidence, and, as of a week after the robbery, no one had attempted to claim the cell phone. (*Ibid.*) A detective removed the cell phone's battery to view identification numbers to identify the owner. (*Ibid.*) In his motion to suppress, the defendant contended the detective performed an illegal search when he removed the cell phone's battery. (*Id*. at pp. 364-365.) The trial court denied the motion on the ground that the defendant had abandoned the cell phone. (*Id*. at p. 365.) The Court of Appeal agreed, concluding the defendant abandoned the cell phone when he left it in the store at the scene of a crime, fled, and did not attempt to recover the cell phone. (*Ibid.*) The court noted that the defendant's act in fleeing the scene "evinc[ed] his intent not to reclaim" the cell phone. (*Id*. at p. 366.)

Mitchell distinguishes *Daggs* on the ground that, in that case, the defendant abandoned his cell phone in a public place, whereas here Mitchell left his cell phone in a private motor vehicle that was later recovered by its owner. While this could possibly be a relevant distinction in another case, it is not one under the circumstances here. Indeed,

*Daggs* is more harmful to Mitchell's position than helpful. As the *Daggs* court noted, " '[a]n important consideration in evaluating a privacy interest is whether a person has taken normal precautions to maintain his or her privacy.' " (*Daggs, supra*, 133 Cal.App.4th at p. 368.) The BMW was indeed a private motor vehicle. However, Mitchell used it to evade an officer in a high-speed chase after he tried to detain him, exited the car leaving the engine running and the door open, and fled on foot, while the vehicle was left to collide with a house. Under these circumstances, it cannot reasonably be argued that Mitchell took normal precautions, or any precautions, to maintain his privacy interests in the cell phone. (*Ibid*.)

We conclude that substantial evidence supports the determination that, "by his conduct, [Mitchell] objectively manifested an intent to abandon his property and thereby relinquished any reasonable expectation of privacy with respect to it." (*Daggs, supra*, 133 Cal.App.4th at p. 369.)

E. *GPS Monitoring of the BMW*

Mitchell asserts that, while the trial court correctly concluded that GPS monitoring of the BMW violated the Fourth Amendment, the court "erred in failing to suppress all law enforcement observations stemming from the fruits of illegal law enforcement behavior . . . ." We disagree.

Mitchell relies on *Wong Sun v. United States* (1963) 371 U.S. 471. As our Supreme Court explained, the United States Supreme Court in *Wong Sun* "held that an illegal arrest immediately preceding the procurement of evidence 'rendered (that evidence) inadmissible as the "fruit" of the agents' illegal action." (*People v. Sesslin* (1968) 68 Cal.2d 418, 427.) However, not "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." (*Wong Sun, supra*, 371 U.S. at pp. 487-488.) "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by

means sufficiently distinguishable to be purged of the primary taint.' " (*Id*. at p. 488.) "That degree of 'attenuation' which suffices to remove the taint from evidence obtained directly as a result of unlawful police conduct requires at least an intervening independent act by the defendant or a third party which breaks the causal chain linking the illegality and evidence in such a way that the evidence is not in fact obtained 'by exploitation of that illegality.' " (*People v. Sesslin, supra*, 68 Cal.2d 418 at p. 428.)

In *In re Richard G.*, the case on which the prosecutor and the trial court relied, the Court of Appeal stated: "An individual's decision to commit a new and distinct crime, even if made during or immediately after an unlawful detention, is an intervening act sufficient to purge the 'taint' of a theoretically illegal detention." (*In re Richard G.* (2009) 173 Cal.App.4th 1252, 1262; accord, *People v. Coe* (1991) 228 Cal.App.3d 526, 531 [the "commission of a new crime by the defendant will ordinarily be an intervening independent act of the defendant's free will, which purges the primary taint of prior police misconduct"].) That court stated that the exclusionary rule "does not immunize crimes of violence committed on a peace officer, even if they are preceded by a Fourth Amendment violation." (*In re Richard G.*, *supra*, 173 Cal.App.4th at p. 1261.) The court noted, for example, that the exclusionary rule could not be expected to "operate to exclude testimony that an unlawfully arrested person shot the arresting police officer." (*Ibid*.) Where "a police officer or third party sees a defendant commit a new crime at the same time as the defendant is subjected to an unlawful detention or search," it cannot be said that the evidence of the new crime " 'resulted from' or [was] 'caused by' the unlawful arrest." (*Id*. at p. 1262.) "Under those circumstances, the defendant's new criminal behavior breaks the causal link between any constitutional violation and evidence of the new crime." (*Ibid*.)

We conclude that evidence of Mitchell's resisting police and striking a police dog was admissible despite the unlawful use of the GPS tracking device. Mitchell's decision to commit these additional crimes was an intervening, independent act that dissipated or

14

purged any "taint" from the illegal GPS tracking. (*In re Richard G., supra*, 173 Cal.App.4th at p. 1262; see also *People v. Cox* (2008) 168 Cal.App.4th 702, 712 [choice to resist arrest after illegal detention and to flee "were independent, intervening acts, sufficiently distinct from the illegal detention to dissipate the taint"].) The trial court properly declined to suppress evidence of law enforcement observations concerning these acts which supported counts six and seven.

## II

### *Motion to Dismiss Count One*

Mitchell next argues that the trial court erred in denying his motion to dismiss count one based on insufficiency of the evidence. Again, we disagree.

A. *"Assault Weapons" and Transporting an Assault Weapon*

Section 30510 defines "assault weapon" with a list of specified semiautomatic firearms. Section 30515 additionally provides, in part: "Notwithstanding Section 30510, 'assault weapon' also means," among other things, "any of the following: [¶] (1) A semiautomatic, centerfire rifle that does not have a fixed magazine but has any one of the following: [¶] (A) A pistol grip that protrudes conspicuously beneath the action of the weapon. [¶] (B) A thumbhole stock. [¶] (C) A folding or telescoping stock. [¶] (D) A grenade launcher or flare launcher. [¶] (E) A flash suppressor. [¶] (F) A forward pistol grip." (§ 30515, subd. (a)(1).)

Mitchell was charged in count one with transporting an assault weapon. "Any person who, within this state, . . . transports, . . . any assault weapon . . . , except as provided by this chapter, is guilty of a felony . . . ." (§ 30600, subd. (a).) As the trial court instructed the jury, to prove Mitchell was guilty, the prosecution was required to prove that: "One, the Defendant transported an assault weapon, specifically an AR-15 rifle. [¶] Two, the Defendant knew that he transported it. [¶] And, three, the Defendant knew or reasonably should have known that it had characteristics that made it an assault weapon." (CALCRIM No. 2560.)

15

B. *Additional Background*

In addition to Detective Ghaffarpour's testimony about the AR-15 rifle he found in the BMW, Sergeant William Vernon testified as an expert on firearms including assault rifles. Sergeant Vernon viewed People's Exhibit 5, in which the AR-15 rifle found in the BMW appeared. He identified features that rendered the AR-15 rifle an assault weapon, including a pistol grip that protruded prominently below the receiver of the rifle; an "A2 birdcage flash hider" that disperses the muzzle flash of the gunfire; and what appeared to be a telescoping stock, although Sergeant Vernon testified he would have to examine the AR-15 rifle itself to be certain about the stock. The AR-15 rifle also had a magazine release button or "bullet button" which could be depressed allowing the magazine to be removed. Sergeant Vernon testified that the AR-15 rifle was a centerfire rifle based on the rifle's use of centerfire ammunition, that it was semiautomatic based on the presence of a gas tube and gas block, that it did not have a fixed magazine, and that it had a pistol grip, a flash hider, and possibly a telescoping stock, bringing it within the definition of an assault weapon. He testified the AR-15 rifle was, indeed, an assault weapon. On cross-examination, Sergeant Vernon acknowledged he did not test fire the AR-15 rifle and could not say with 100 percent certainty that it was a functioning firearm.

C. *Standard of Review*

An appellate court reviews the denial of a section 1118.1 motion "using the same standard 'employed in reviewing the sufficiency of the evidence to support a conviction.' " (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35.) The appellate court thus examines " ' "the entire record in the light most favorable to the judgment" ' to determine whether it discloses substantial evidence—' "evidence that is reasonable, credible, and of solid value" '—' "from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*Ibid*.) "Our review ' " 'presume[s] in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " ' " (*Id*. at pp. 35-36.) Our inquiry is into "whether there is ' " 'substantial

evidence of the existence of each element of the offense charged' " ' such that any rational jury may have convicted" Mitchell.  (*Id*. at p. 36.)

D. *Analysis*

Sergeant Vernon testified that the AR-15 rifle pictured in People's Exhibit 5 was a semiautomatic centerfire rifle based on the rifle's ammunition and the presence of a gas tube and gas block, and that it did not have a fixed magazine, noting it had a "bullet button" style magazine release button.  Sergeant Vernon testified that the AR-15 rifle had at least two, and likely three, additional features, any one of which would render the rifle an assault weapon.  (§ 30515, subd. (a)(1).)  He unequivocally testified that the rifle had a pistol grip that protruded prominently below the receiver of the rifle (*Id*., subd. (a)(1)(A)), and an "A2 birdcage flash hider" that disperses the muzzle flash (*Id*., subd. (a)(1)(E)).  Additionally, it appeared to have a telescoping stock (*Id*., subd. (a)(1)(C)), although he would have to examine the rifle to be certain.  Based on these features, Sergeant Vernon testified the AR-15 rifle found in the BMW was an assault weapon.  Detective Ghaffarpour also testified the AR-15 rifle was a centerfire rifle with a detachable magazine and a pistol grip.  Substantial evidence supported the jury's verdict on count one.

Mitchell's argument that the evidence was insufficient rests in part on Sergeant Vernon's acknowledgment in cross-examination that he could not say with 100 percent certainty that it was a functioning semiautomatic firearm.  He explained that he could not guarantee that it was not broken somehow.

Notwithstanding these remarks, Sergeant Vernon's testimony was substantial evidence the AR-15 rifle was an assault weapon, and he amply stated his reasons for reaching this conclusion.  The jury could reasonably have inferred that this loaded assault weapon, with a live round in the chamber, being transported by Mitchell and concealed under a black plastic bag, was a functional assault weapon.  The jury also could have inferred that a reason for Mitchell's flight from law enforcement was his awareness of the

17

operational assault weapon in the BMW. " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 345.)

Relevant to the element that Mitchell "knew or reasonably should have known that [the rifle] had characteristics that made it an assault weapon" (CALCRIM No. 2560), Mitchell asserts there was no evidence concerning his knowledge of firearms. As stated in *In re Jorge M.*, a case involving possession of an assault weapon rather than transportation but which supplied the knowledge requirement for violation of section 30600, subdivision (a) (Judicial Council of Cal. Crim. Jury Instns. (2024 ed.) Authority to CALCRIM No. 2560, p. 430), a conviction under that section requires "knowledge of, or negligence in regard to, the facts making possession criminal" (*In re Jorge M.* (2000) 23 Cal.4th 866, 887 [addressing former § 12280, subd. (b)]). As CALCRIM No. 2560 made clear, the People must prove Mitchell "*knew or reasonably should have known* the firearm possessed the characteristics" of a prohibited assault weapon. (*In re Jorge M.*, *supra*, 23 Cal.4th at p. 887.) "The question of the defendant's knowledge or negligence is, of course, for the trier of fact to determine, and depends heavily on the individual facts establishing possession in each case. Nevertheless, . . . the Legislature presumably did not intend the possessor of an assault weapon to be exempt from the [Roberti-Roos Assault Weapons Control Act of 1989's; Stats. 1989, ch. 19, § 3] strictures merely because the possessor did not trouble to acquaint himself or herself with the gun's salient characteristics." (*Id*. at pp. 887-888.) Generally, someone with "substantial and unhindered possession" of the assault weapon is expected to know if it is a prohibited model or has features making it prohibited. (*Id*. at p. 888.)

Here, Mitchell was alone in the car that contained the AR-15 rifle. The evidence also established Mitchell went to purchase the BMW with T.M., that he picked it out, appeared on the credit application, and that other property belonging to Mitchell was

found in the car. The jury could have reasonably inferred Mitchell had substantial, if not exclusive, possession and control over the BMW and its contents. The jury also could have inferred that Mitchell had "substantial and unhindered possession" of the AR-15 rifle such that he could reasonably be expected to know of the features rendering it prohibited. That Mitchell was reasonably aware of the rifle's features is further supported by the fact that the qualifying features including, at the least, that it was a semiautomatic centerfire rifle with a detachable magazine and a pistol grip protruding conspicuously beneath the action were readily discernible. These facts are sufficient for the jury to reasonably conclude Mitchell knew or reasonably should have known the AR-15 rifle was a prohibited assault weapon.

III

*Special Jury Instruction*

During deliberations on January 20, 2023, the jury submitted a question to the trial court, asking, "What is the standard definition to apply to 'reasonably should have known' as it applies to Count 1 . . . ?" The prosecutor noted that another court addressed a similar question by reinstructing the jurors with language from CALCRIM No. 200: "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings," and the court here eventually conveyed this language to the jury. At 3:42 p.m. the jury indicated it had reached verdicts on six of the seven counts and asked how to proceed. At 4:11 p.m., over Mitchell's objection, the trial court provided the jury with this special instruction derived from *In re Jorge M., supra*, 23 Cal.4th 866: " 'Reasonably should have known' is meant to describe that the People need not prove that the defendant actually knew of the characteristics of the AR 15 as an illegal weapon but that generally, a person possessing an object should take reasonable steps to ascertain the characteristics of the object possessed. [¶] You may consider the circumstances of the possession in determining whether the defendant reasonably should

19

have known.  [¶]  The People must prove this charge beyond a reasonable doubt."  Nine minutes later, the jury indicated it had reached a verdict.

Mitchell argues the trial court erred in giving this special instruction because it was an incorrect statement of law, and it diminished the prosecution's burden of proof. The People agree, as do we.

" '[I]n criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' "  (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.)  "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.)  "A claim of instructional error is reviewed de novo."  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

The trial court's special instruction told the jurors, in part, that " 'Reasonably should have known' " incorporates the idea that, "generally, a person possessing an object should take reasonable steps to ascertain the characteristics of the object possessed."  The trial court incorporated and modified language from *In re Jorge M.* which reads:  "[B]ecause of the general principle that all persons are obligated to learn of and comply with the law, in many circumstances *a trier of fact properly could find that a person who knowingly possesses a semiautomatic firearm reasonably should have investigated and determined the gun's characteristics*."  (*In re Jorge M., supra*, 23 Cal.4th at p. 885, italics added.)  In *In re Jorge M.*, our Supreme Court was not addressing a jury instruction.  As courts have repeatedly cautioned, there is a significant danger in "instructing a jury with language from an opinion that has nothing to do with jury instructions."  (*People v. Southard* (2021) 62 Cal.App.5th 424, 427; see *Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 526 ["judicial opinions are not

written as jury instructions, are notoriously unreliable as such, and may have a confusing effect upon a jury"].)

The People represent that they have found no jury instruction, statute, or case law supporting the premise that " 'reasonably should have known' " is to be interpreted as stated in the special instruction here. Nor have we in our own independent research.

The trial court's special instruction could have the effect of lowering the prosecution's burden of proof. To establish guilt on count one, the prosecution was required to prove beyond a reasonable doubt that "the defendant knew or reasonably should have known that [the rifle] had characteristics that made it an assault weapon." (CALCRIM No. 2560; see *In re Jorge M.*, *supra*, 23 Cal.4th at pp. 869-870, 887.) The special instruction, however, imposed an affirmative duty on any "person possessing an object" to "take reasonable steps to ascertain the characteristics of the object possessed." This is not an element appearing in section 30600 or in the CALCRIM instructions. Nor did our Supreme Court in *In re Jorge M.* indicate this was an element of possession of an assault weapon. Rather, the Supreme Court only stated in that case that "*a trier of fact properly could find* that a person who knowingly possesses a semiautomatic firearm reasonably should have investigated and determined the gun's characteristics." (*In re Jorge M., supra*, at p. 885, italics added.)

As Mitchell and the People agree, the special instruction renders a violation of section 30600, subdivision (a) something akin to a strict liability offense. Under the special instruction, most if not all individuals could be found to have had a duty to ascertain the characteristics of the object possessed. In *In re Jorge M.*, however, the Supreme Court specifically stated that possession of an assault weapon was not intended to be a strict liability offense. (*In re Jorge M., supra*, 23 Cal.4th at p. 869.)

As given, we conclude the special instruction was erroneous.

" '[I]nstructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the

error did not contribute to the verdict.' " (*People v. Aledamat* (2019) 8 Cal.5th 1, 10.) We will make quick work of our harmless error analysis. At 11:48 a.m., the jury sought clarification on the "definition to apply to 'reasonably should have known' " in reference to count one. The trial court reinstructed the jury with language from CALCRIM No. 200. At 3:42 p.m., the jury indicated it had reached verdicts on six of the seven counts and asked how to proceed. At 4:11 p.m., the court provided the jury with the special instruction. Less than 10 minutes later, the jury indicated it had reached a verdict. Under these circumstances, we cannot conclude beyond a reasonable doubt that the error in giving the special instruction did not contribute to the verdict.

We shall vacate the judgment on count one and remand to the trial court where the People can elect whether to retry Mitchell on that count.

## DISPOSITION

The judgment on count one is reversed.  The entire sentence is vacated.  The matter is remanded to afford the People the opportunity to retry Mitchell on count one if they choose.  Following retrial on count one, or upon the People's election not to retry Mitchell on count one, the trial court shall conduct a full resentencing.  The judgment is otherwise affirmed.

_____\s\_____,
Krause, J.

We concur:

\_\_\_\_\_\s\_____,
Mauro, Acting P. J.

\_\_\_\_\_\s\_____,
Mesiwala, J.